UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION FUND, derivatively, on behalf of DISCOVER FINANCIAL SERVICES, <br><br> Plaintiff, <br><br> v. <br><br> DAVID W. NELMS, R. MARK GRAF, CARLOS MINETTI, ROY A. GUTHRIE, HARIT TALWAR, MARY MARGARET HASTINGS, ROGER C. HOCHSCHILD, LAWRENCE A. WEINBACH, E. FOLLIN SMITH, MICHAEL H. MOSKOW, MARY K. BUSH, THOMAS G. MAHERAS, CYNTHIA A. GLASSMAN, PHILIP A. LASKAWY, GREGORY C. CASE, JEFFREY S. ARONIN, ROBERT M. DEVLIN, RICHARD H. LENNY, and MARK A. THIERER, <br><br> Defendants. <br><br> -and- <br><br> DISCOVER FINANCIAL SERVICES, <br><br> Nominal Defendant. | Civil Action No. _____ <br><br><br><br><br><br><br><br><br><br> **JURY TRIAL DEMANDED** <br><br> **FILED UNDER SEAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Steamfitters Local 449 Pension Fund ("Plaintiff"), by its undersigned attorneys, submits this Verified Shareholder Derivative Complaint in the name and on behalf of the nominal defendant Discover Financial Services ("Discover" or the "Company") against certain officers and

1

members of the Board of Directors of Discover (the "Board") named herein (collectively, the "Individual Defendants"). Plaintiff's allegations are based upon personal knowledge as to itself and its own acts, and upon information and belief developed from the investigation and analysis of its counsel, which includes, among other things, the review of certain of the Company's Board of Director minutes, Audit and Risk Committee minutes, and Board materials related to the Company's Protection Products (as defined herein) garnered through a request for such information pursuant to 8 Del. C. §220, public filings by Discover with the U.S. Securities and Exchange Commission ("SEC"), as well as, press releases, news reports, analyst reports, matters of public record available from various state and federal government websites, complaints pending against the Company in state and federal courts, and other information available in the public domain.

## SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of nominal defendant Discover, by one of its shareholders against the Individual Defendants seeking to remedy defendants' breaches of fiduciary duties and other violations of law.

2.      Discover is a direct banking and payment services company offering credit cards, student loans, personal loans, and deposit products through its Discover Bank subsidiary and home loans through its Discover Home Loans, Inc. subsidiary. The Company operates the Discover Network, its credit card payment network; the PULSE network, its automated teller machine, debit and electronic funds transfer network; and Diners Club International, its global payments network.

3.      From December 1, 2007 to August 31, 2011 (the "Relevant Period"), the Individual Defendants, in dereliction of their oversight duties and responsibilities and otherwise in violation of their fiduciary duties, caused the Company to market various fee based credit card account add-on

features to customers in a highly misleading fashion, including enrolling customers in fee-based products known as the Discover Payment Protection, Identity Theft Protection, Wallet Protection, and Credit ScoreTracker (collectively, the "Protection Products"), without their consent as alleged in the consumer class actions, State Attorneys General actions and by regulatory authorities such as the Federal Deposit Insurance Company ("FDIC") and Consumer Financial Protection Bureau ("CFPB"). The Company claimed that the Protection Products offered Discover customers the benefits of financial protection against temporary hardships such as job loss, sickness, identity theft, lost wallets and/or purses, and events that would adversely affect customers' credit scores. ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4.      As a result of these deceptive marketing tactics, on September 21, 2012, the Company announced that it had reached an agreement in principle with the FDIC and CFPB in connection with an ongoing federal probe of Discover's improper and illegal marketing practices of the Protection Products. Pursuant to the terms of the Joint Consent Order, Discover was required to: (1) pay $200 million in restitution to the approximately 3.5 million Discover cardholders who were duped into purchasing the protection products; (2) desist from engaging in further deceptive and

illegal marketing practices; (3) submit to an ongoing independent audit; and (4) pay $14 million in penalties to the FDIC and CFPB.[1]

5.    The Joint Consent Order was based on the FDIC and CFPB determination that during the period December 1, 2007 through August 31, 2011, as a result of misleading language in the scripts and the actions of Discover's in-house and third-party telemarketers, consumers were:[2]

- Mislead about the fact that there was a charge for the products: Discover telemarketing scripts often used language implying that the products were additional free "benefits," rather than products for which a fee would be applied to the account;

- Mislead about whether they had purchased a product: The telemarketing scripts frequently suggested that consumers would not be charged for the products until after having a chance to review printed materials from Discover. Discover, however, did not provide consumers with the information until after Discover had already initiated the consumer's purchase of the product;

- Enrolled without their consent: Discover representatives processed the add-on product purchases without some consumers' consent. These consumers were then charged for the product on their Discover card; and

- Withheld material information about the eligibility requirements for certain benefits: Discover's telemarketers typically did not disclose critical eligibility

---

[1] On September 21, 2012, Discover, the FDIC and CFPB entered into a Stipulation and Consent to the Issuance of a Joint Consent Order, Order for Restitution, and Order to Pay Civil Money Penalty ("Stipulation"). On September 24, 2012, the FDIC and CFPB issued the Joint Consent Order, Order for Restitution, and Order to Pay Civil Money Penalty ("Joint Consent Order"). The Stipulation and Joint Consent Order are attached as Exhibits A and B.

[2] *See,* Factsheet on the Joint Consent Order entitled "Ending Deceptive Marketing Practices" issued jointly by the FDIC and CFPB, which refers to the bullets points set forth above in ¶ 5 (Exhibit C).

requirements for certain payment protection benefits, such as the exclusions for

pre-existing medical conditions and certain limitations concerning employment.

6.    Discover does not deny that it engaged in these practices as clearly stated in the

Stipulation, which was signed by the then existing Board of Directors of Discover Bank, which is a

subsidiary of Discover.[3] *See also,* Joint Consent Order at p. 2. Three of the seven members of

Discover Bank are also members of Discover's Board of Directors and/or senior management

including Individual Defendants David Nelms, Roger Hochschild and Carlos Minetti. While the

deceptive marketing tactics continued unabated during the Relevant Period, the Company's Board of

Directors were informed about the problems with the Protection Products and failed to take prompt

and corrective action and exercise their oversight duties and responsibilities in breach of their

fiduciary duties.

7.    As a result, Discover has been a party to numerous legal proceedings with regard to

improper marketing practices of its Protection Products.[4] These legal proceedings: Kelmer,

Ackerman, Walker, Conroy, Alexander, Callahan, Sack, Boyce, Triplett and Carter class action

complaints all allege, amongst other things and similar to the findings of fact by the FDIC and CFPB,

that Discover "[e]nrolled [Plaintiffs and the members of the Class for Protection Products] without

---

[3] *See,* Stipulation ¶ 7 ("Discover ... without ... denying any of the charges of unsafe or unsound banking practices, any of the findings of fact, or violations of, hereby consents and agrees to the issuance of the JOINT CONSENT ORDER by the FDIC and the CFPB.").

[4] *See, Kelmer v. Discover Financial Services,* No. 10-CV-00050-GPM-CJP (S.D. Ill.) ("Kelmer"); *Ackerman v. Discover Financial Servs., Inc.,* No. 10-CV-02118-JAP-LHG (D.N.J.) ("Ackerman"); *Walker v. DFS Servs. LLC,* No. 10-CV-03013-SI. (N.D. Ca.) ("Walker"); *Conroy v. Discover Financial Services,* No. 10-CV-05260-MMM-E (C.D.Ca.) ("Conroy"); *Alexander v. Discover Financial Services, Inc.,* No. 10-CV-02754 (D.S.C) ("Alexander"); *Callahan v. Discover Financial Services, Inc.,* No. 10-CV-07181-JWD (N.D. Ill.) ("Callahan"); *Sack v. DFS Services, LLC,* No. 10-cv-02906-JPM-CGC. (W.D.Tn.) ("Sack"); *Boyce v. DFS Services, LLC,* No. 11-CV-00265-LDD (E.D.Pa.) ("Boyce"); *Triplett v. Discover Financial Services, Inc.,* No. 11-CV-20519-AJ. (S.D. Fl.) ("Triplett"); and *Carter v. Discover Financial Services, Inc.,* No. 11-CV-01656-BMS (E.D.Pa.) ("Carter").

their consent." [5] ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ According to the FDIC and CFPB, and not denied by Discover,

the specific misconduct continued unabated until August 2011, well after the Defendants consciously

disregarded problems with the Protection Products as far back as December 2007, ignored regulator

concerns beginning in 2009 and became aware of the specific misconduct in April 2010 based on the

class action litigation, a clear breach of the Board's oversight duties. Joint Consent Order (Exh. B),

Findings of Fact ¶¶ 1-7; *see also,* Factsheet on Joint Consent Order (Exh. C).

      8.    The Company is also facing lawsuits by the Attorney Generals of Hawaii,

Mississippi and New Mexico regarding its deceptive marketing practices of the Protection Products.[6]

---

[5] *See,* Factsheet on Joint Consent Order (Exhibit C); *See e.g.,* Kelmer ¶ 10 ("In fact, Plaintiff and Class members were enrolled in Discover® Payment Protection Plan without having consented to enrollment."); Ackerman ¶ 10 ("Discover knowingly and willfully imposes the Plan feature on the Card members' accounts without receiving the Card Members' consent or authorization ..."); Walker ¶ 13 ("Discover knowingly and willfully imposes the Plan feature on the Card members' accounts without receiving the Card Members' consent or authorization ..."); Conroy ¶ 4 ("Discover manipulates the Payment protection sales process by ... enrolling cardholders in Payment protection without advance notice or consent by the cardholder ..."); Alexander ¶ 29 ("Discover knowingly and willfully imposes the Plan feature on the Card Members' accounts receiving the Card Members' consent or authorization ..."); Callahan ¶ 20 ("Discover enrolls its credit card account holders in its Payment Protection program without their authorization ..."); Sack ¶ 13 ("agents ... enroll the individuals in the Plan without consent."); Boyce ¶ 5 (Discover "employ[s] confusing and misleading sales tactics to surreptitiously ... enroll individuals in the Plan without their knowledge or consent."); Triplett ¶ 41 ("In some instances, Payment Protection has been unilaterally imposed upon consumers."); Carter ¶ 34 ("Consumers are often unaware they are enrolled in Payment Protection because Defendants enroll them without their consent.").

[6] See, *State of Hawaii v. Discover Financial Services, Inc.,* Civil No. 12-1-0984-04 ECN alleging, in part, "Defendants often enroll consumers in these products even though the consumers did not assent to pay for them."; *State of Mississippi v. Discover Financial Services, Inc.,* Civil No. G2012.1082, alleging in part that "Defendants often enroll consumers in these products even though the consumers did not assent to pay for them."; *State of New Mexico v. Discover Financial Services, Inc.* Cause No. D-101-Cv-2013-001107, alleging that "Defendants often enroll consumers in these products even though the consumers did not assent to pay for them."

Some Attorney General cases have already settled. In October 2011 Discover settled Protection

Product litigation with the State of Minnesota by entering into a Consent Judgment. *See State of*

*Minnesota v. Discover Financial Services,* Court File No. 27-CV-10-27510 ("Minnesota Consent

Judgment").[7] The Minnesota Consent Judgment provided for Discover to pay $2 million "for

investigative costs, civil penalties, and for the benefit of the State and the persons whom the State

alleges were harmed," *Id.* at ¶ 2, as well as prospective relief. *Id.* at ¶ 1. West Virginia also settled

with Discover for $1.95 million. The West Virginia complaint also alleged that "Defendants often

enroll consumers for such services without the consumers' consent." *See State of West Virginia v.*

*Discover Financial Services, Inc.,* Civil Action No. 11-C-86-N at ¶ 4. There was also a settlement

with the State of Missouri. According to the Company's most recent Form 10-Q file with the SEC on

November 1, 2013, it was disclosed that, "[o]n August 26, 2011, the Attorney General of Missouri

issued a request for information to the Company in connection with an investigation to determine

whether the Company has engaged in conduct that violates Missouri law in the marketing of its

payment protection product to its credit card customers. The Company has resolved this matter with

the Attorney General." There was no disclosure detailing the resolution of the matter with the

Missouri Attorney General.

       9.      The Company was also named as a defendant in a class action lawsuit where it is

alleged that Discover contacted the members of the class on their cellular telephones without their

express consent in violation of the Telephone Consumer Protection Act ("TCPA"). That lawsuit also

dates back to 2007 when Discover received a citation issued by the Federal Trade Commission for

TCPA violations determining that the Company had "made prerecorded telephone calls to consumers

---

[7] Attached as Exhibit D.

who 'had not expressly invited or authorized the call[s].'" The Company ultimately settled the litigation in January 2014 for approximately $8.7 million.

10.     These legal and regulatory proceedings have exposed Discover to hundreds of millions of dollars in damages in addition to severely damaging Discover's reputation and goodwill in the market. The Individual Defendants were on notice generally about problems with the Protection Products as far back as December 2007 and ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that were the same as those trumpeted by the State Attorney Generals and the FDIC and CFPB that ultimately led to the over $200 million settlement with federal regulators. Despite having such knowledge, Defendants permitted the conduct to continue until August 2011 as alleged in the Joint Consent Order, the findings of fact of which Defendants do not deny.

11.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮     ▮▮▮▮▮▮▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



- In May 2009, the issue of credit card company accountability and predatory lending led to the passage of the Credit Card Accountability Responsibility and Disclosure Act of 2009. The new law put in place protections for consumers from tactics like fee traps, required simpler interest calculations, required opt-in for over-limit spending fees, and installed other similar measures. The new law put Defendants on notice that there would be enhanced scrutiny in connection with credit card add-on product fees.

- Also, in 2009, the United States General Accountability Office published a report analyzing the marketing practices utilized by the credit card industry finding that most credit card issuers were currently engaging in improper practices including improper, incomplete, and/or misleading delivery of plan information to consumers and retailers. This report should have put the Individual Defendants on notice that regulators were sensitive to predatory credit card practices.

12. 









13.    As detailed above, Defendants breached their fiduciary duties causing the

Company to incur over $200 million to remedy the misconduct associated with the sales and

marketing tactics in connection with Discover's Protection Products. In addition, to date the

Board has not sought to clawback compensation from the Executive Defendants and other

members of Company management that were responsible for implementation and operation of

the illegal sales and marketing practices that damaged the Company. Therefore, Plaintiff brings

this action against the Individual Defendants to remedy the breaches of fiduciary duty by the

Individual Defendants.

<h3 style="text-align:center;">JURISDICTION AND VENUE</h3>

14.    This Court has jurisdiction under 28 U.S.C. §1331 because this case involves

alleged violations of federal law by the defendants, including 15 U.S.C. §45(a)(1) and 12 U.S.C.

§§5531, 5536.

15.     This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because (i) one or more of the Defendants either resides or maintains executives offices in the District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in the District; and (iii) defendants have received substantial compensation and other transfers of money in the District by doing business and engaging in activities having an effect in the District.

## THE PARTIES

### Plaintiff

17.     Plaintiff Steamfitters Local 449 Pension Fund is the beneficial owner of over 9,700 shares of Discover and has been a continuous shareholder of the Company since at least July 2007.

### Nominal Defendant

18.     Nominal Defendant Discover is a Delaware corporation, maintaining its principle executive offices at 2500 Lake Cook Road, Riverwoods, Illinois. According to its public filings, Discover is a direct banking and payment services company. It offers credit cards, student loans, personal loans, and deposit products. Discover is the third largest credit card brand in the United States, with nearly 50 million cardholders. Discover is publicly traded on the New York Stock Exchange under the ticker symbol DFS.

15

**Individual Defendants**

19.     Defendant David W. Nelms ("Nelms") has served as Discover's Chief Executive Officer ("CEO") since 2004 and Chairman of the Board since January 2009. He has also served as a director of Discover since 1998. Prior to his service at Discover, Defendant Nelms was a Senior Executive and Vice Chairman of MBNA America Bank from 1992 to 1998. During Defendant Nelms' tenure, MBNA America Bank was the world's largest independent credit card issuer and his prior experience there should have given him increased awareness of the inherent risks of the credit card industry. Defendant Nelms was a signatory to the Stipulation with the FDIC and CFPB. Defendant Nelms is a citizen of Illinois.

20.     Defendant R. Mark Graf ("Graf") has served as Chief Financial Officer ("CFO"), Chief Accounting Officer ("CAO"), and Executive Vice President of Discover since April 2011. Defendant Graf is a citizen of Illinois.

21.     Defendant Carlos Minetti ("Minetti") has served as Discover's Executive Vice President – Consumer Banking and Operations since April 2010. Previously, he served as Discover's Executive Vice President, Cardmember Services and Consumer Banking from September 2006 to April 2010, and Executive Vice President, Cardmember Services and Risk Management from January 2003 to September 2006. Defendant Minetti was a signatory to the Stipulation with the FDIC and CFPB. Defendant Minetti is a citizen of Illinois.

22.     Defendant Roy A. Guthrie ("Guthrie") served as Discover's CFO, Chief Accounting Officer, and Executive Vice President from 2005 to April 2011. Defendant Guthrie is a citizen of Texas.

16

23.     Defendant Harit Talwar ("Talwar") has served as Discover's Executive Vice President – US Cards since April 2010. Previously Defendant Talwar served as Discover's Executive Vice President, Card Programs and Chief Marketing Officer from December 2008 to April 2010, and as Executive Vice President, Discover Networks from December 2003 to December 2008. Defendant Talwar is a citizen of Illinois.

24.     Defendant Mary Margaret Hastings Georgiadis ("Georgiadis") served as Discover's Executive Vice President, Card Products and Chief Marketing Officer of Discover from 2004 to 2008. As Chief Marketing Officer, her responsibilities included managing the Company's marketing practices for all products, including Discover's Protection Products. Defendant Georgiadis is a citizen of Illinois.

25.     Defendant Roger C. Hochschild ("Hochschild") has served as Discover's President and Chief Operating Officer ("COO") since 2004. Previously he served as Discover's Executive Vice President and Chief Marketing Officer from 1998 to 2001. Prior to his service at Discover, Defendant Hochschild worked alongside Defendant Nelms at MBNA America Bank from 1994 to 1998 as a Senior Executive Vice President. During Defendant Hochschild's tenure, MBNA America Bank was the world's largest independent credit card issuer and his prior experience there should have given him increased awareness of the inherent risks of the credit card industry. Defendant Hochschild was a signatory to the Stipulation with the FDIC and CFPB. Defendant Hochschild is a citizen of Illinois.

26.     Defendant Lawrence A. Weinbach ("Weinbach") has served as a director of Discover since June 2007. He has also served as the Company's lead director since January 2009. Defendant Weinbach is a citizen of Connecticut.

17

27.     Defendant E. Follin Smith ("Smith") has served as a director of Discover since June 2007. Defendant Smith has also served on Discover's Audit and Risk Committee (formerly known as the "Audit Committee" prior to November 2009) since June 2007 and been its Chairman since September 26, 2008. Defendant Smith is a citizen of Pennsylvania.

28.     Defendant Michael H. Moskow ("Moskow") has served as a director of Discover since September 2007. Defendant Moskow has also served on Discover's Audit and Risk Committee since September 20, 2007. Defendant Moskow is a citizen of Illinois.

29.     Defendant Mary K. Bush ("Bush") has served as a director of Discover since June 2007. Defendant Bush also served as a member of Discover's Audit Committee from June 2007 to September 20, 2007. Defendant Bush is a citizen of Maryland.

30.     Defendant Thomas G. Maheras ("Maheras") has served as a director of Discover since September 2008. Defendant Maheras has also served on Discover's Audit and Risk Committee since September 2008. Defendant Maheras is a citizen of New York.

31.     Defendant Cynthia A. Glassman ("Glassman") has served as a director of Discover since February 2009. Defendant Glassman has also served on Discover's Audit and Risk Committee since February 2009. Defendant Glassman is a citizen of Virginia.

32.     Defendant Philip A. Laskawy ("Laskawy") served as a director of Discover from June 30, 2007 to September 26, 2008. Defendant Laskawy also served as the Chairman of Discover's Audit Committee from June 2007 to September 26, 2008. Defendant Laskawy is a citizen of Connecticut.

33.     Defendant Gregory C. Case ("Case") has served as a director of Discover since June 2007. Defendant Case has also served as the Chairman of Discover's Compensation and

Leadership Development Committee (formerly known as the "Compensation Committee" prior to December 2012) since 2008. Defendant Case is a citizen of Illinois.

34.     Defendant Jeffrey S. Aronin ("Aronin") has served as a director of Discover since June 2007. Defendant Aronin has also served on Discover's Compensation and Leadership Development Committee since 2007. Defendant Aronin is a citizen of Illinois.

35.     Defendant Robert M. Devlin ("Devlin") served as a director of Discover from June 2007 until April 2013. Defendant Devlin also served on Discover's Compensation and Leadership Development Committee from 2007 until April 2013. Defendant Devlin is a citizen of New York.

36.     Defendant Richard H. Lenny ("Lenny") has served as a director of Discover since February 2009. Defendant Lenny has also served on Discover's Compensation and Leadership Development Committee since January 20, 2011. Defendant Lenny is a citizen of Illinois.

37.     Defendant Mark A. Thierer ("Thierer") has served as a director of Discover since April 17, 2013. Defendant Thierer is a citizen of Illinois.

38.     The defendants identified in ¶¶ 19 & 26-37 are referred to herein as the "Director Defendants." The defendants identified in ¶¶ 19-25 are referred to herein as the "Executive Defendants." The defendants identified in ¶¶ 27-32 are referred to herein as the "Audit and Risk Committee Defendants." The defendants identified in ¶¶ 33-36 are referred to herein as the "Compensation and Leadership Development Committee Defendants." Collectively, the defendants identified in ¶¶ 19-37 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

39.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

40.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

41.     To discharge their duties, the Individual Defendants, as officers and directors of the Company, were required to exercise prudent and reasonable supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

      a)     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

b)     exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority; and

c)     refrain from acting upon material inside corporate information to benefit themselves to the detriment of the Company as a whole.

42.     Discover maintains a Code of Ethics and Business Conduct (the "Code"). The Code clearly establishes the core principles to be followed by the directors, officers and employees of Discover. Specifically, the Code states:

### PRINCIPLES OF THE CODE

FOLLOW BOTH THE LETTER AND THE SPIRIT OF THE LAW AND DISCOVER FINANCIAL SERVICES POLICIES

Discover Financial Services is subject to numerous laws and regulations in a variety of domestic and international jurisdictions. It is your responsibility to understand the laws applicable to your responsibilities and to comply with both the letter and the spirit of these laws. This requires that you avoid not only actual misconduct but also the appearance of impropriety. Assume that any action you take ultimately could be publicized, and consider how you and the Company would be perceived. When in doubt, stop and reflect. Ask questions. If you are unclear about the application of the law to your responsibilities, or if you are unsure about the legality or integrity of a particular course of action, you must seek the advice of your supervisor or Law and Compliance. You will be held personally responsible for any improper or illegal acts you commit during your employment at or service to the Company.

Certain significant policies, laws and regulations are highlighted below and additional information may be found in other applicable Company policies and procedures, including the officer and employee Code of Conduct. This does not constitute a complete listing of the laws, rules, regulations and policies that must be adhered to by every person subject to this Code in the conduct of his or her duties at Discover Financial Services.

\*\*\*

*Fair and Responsible Banking.* The Company is committed to making financial services available to customers and prospective customers on a fair and consistent basis. The Company offers and extends all of its products and services to any qualified applicants without discrimination. Discover Financial Services maintains a program to monitor and enforce its policy on fair and responsible banking.

## ACT IN THE BEST INTERESTS OF CUSTOMERS, THE COMPANY, AND THE PUBLIC

The Company seeks to outperform its competition fairly and honestly through superior performance. Every director, officer, and employee must protect the Company's reputation by dealing fairly with customers, the public, competitors, suppliers, and one another. No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, or misrepresentation of facts.

*** 

## PREVENT THE MISUSE OF INSIDE INFORMATION

You may never, under any circumstances, trade, encourage others to trade, or recommend securities or other financial instruments based on (and in some circumstances, while in the possession of) inside information.

Inside information is all non-public information about the Company or its customers or counterparties that may have a significant impact on the price of a security or other financial instrument, or that a reasonable investor would be likely to consider important in making an investment decision. The determination of whether non-public information is "inside information" in some circumstances may be complex. Consult with Law and Compliance if you are uncertain whether particular information is inside information.

The misuse of inside information may result in corrective action by the Company, up to and including termination of your employment or service, and civil and criminal penalties.

In order to prevent the misuse of inside information and to avoid both real and perceived conflicts of interest, the Company has established policies and procedures governing personal trading of Discover Financial Services securities by directors, officers, and employees, which may differ depending upon your position at Discover Financial Services. You are required to familiarize yourself and comply with these policies and procedures, as they exist today and any future amendments thereto. If you have any questions about your ability to buy or sell securities, you should contact Law and Compliance.

22

## BE HONEST AND FAIR IN YOUR COMMUNICATIONS WITH THE PUBLIC

The Company has a responsibility under the law to provide accurate and complete disclosure to the investing public, and to the extent that you are involved in the preparation of materials for dissemination to the public, you must ensure that the information is accurate and complete in all material respects. In particular, the Company's senior financial officers, executive officers and directors must endeavor to promote accurate, complete, fair, timely and understandable disclosure in the Company's public communications, including documents that the Company files with or submits to the United States Securities and Exchange Commission and other regulators.

Officers and employees must consult their business unit or department for standards that apply to oral and written communications with the public, as well as the circumstances under which communications must be reviewed by supervisors and others. If you become aware of a materially inaccurate or misleading statement in a public communication, you must promptly report it in accordance with the procedures outlined in the Reporting Misconduct section of this Code.

43. In addition to the core principles described above, the Audit and Risk Committee Defendants owed additional duties. Under the Audit and Risk Committee Charter, Defendants Smith, Bush, Glassman, Maheras, Laskawy, and Moskow owed specific duties to Discover to assist the Board in fulfilling its oversight responsibilities. Among other things, the Audit and Risk Committee was appointed by the Board to:

> (a) assist **the Board in its oversight of the integrity of** the Company's consolidated financial statements, **the Company's compliance with legal and regulatory requirements,** the Company's system of internal controls, the Company's risk management, the qualifications and independence of the Company's independent registered public accounting firm ("independent auditor") and the performance of the Company's internal and independent auditors, and (b) prepare a report to be included in the Company's annual proxy statement. (Emphasis added).

44. Similarly, the members of the Compensation and Leadership Development Committee, Defendants Case, Aronin, Devlin, and Lenny, owed separate additional duties. Pursuant

to the Compensation and Leadership Development Committee Charter, the purpose of the committee is to "discharge the Board's responsibilities relating to compensation of the Company's executive officers, to produce an annual report on executive compensation for inclusion in the Company's annual proxy statement, to oversee plans for leadership development, and to exercise and perform the authority, duties and responsibilities set forth in this charter."

45. As such, Defendants Case, Aronin, Devlin, and Lenny, as Compensation and Leadership Development Committee members had the following responsibilities:

The Committee shall:

1. Review and approve corporate goals and objectives relevant to the compensation of the Chief Executive Officer, evaluate his or her performance in light of those goals and objectives, and determine his or her compensation level based on that evaluation. In determining the long-term incentive component of Chief Executive Officer compensation, the Committee should consider the Company's performance and relative shareholder returns, the value of similar incentive awards to counterparts at comparable companies, the awards given to the Chief Executive Officer in past years and such other factors as the Committee considers appropriate.

2. The Committee shall review and discuss with the Company's management the Compensation Discussion and Analysis required by the rules of the Securities and Exchange Commission. Based on such review and discussion, the Committee shall determine whether to recommend to the Board of Directors of the Company that the Compensation Discussion and Analysis be included in the Company's annual report or proxy statement for the annual meeting of stockholders. The Committee shall provide, over the names of the members of the Committee, the required Committee report for the Company's annual report or proxy statement for the annual meeting of stockholders.

3. Oversee the Company's policies on structuring compensation programs for executive officers to preserve tax deductibility, and, as and when required, establish performance goals and certify that performance goals have been attained for purposes of Internal Revenue Code Section 162(m).

4. Review and approve any employment agreement, new hire award or new hire payment proposed to be made with or to a proposed or current executive officer.

5.     Review and approve any severance, change-in-control or similar termination agreement, award or payment proposed to be made with or to any current or former executive officer.

6.     As it determines appropriate, approve, or make recommendations to the Board regarding, non-CEO executive officer (and such other officers as the Committee determines appropriate) compensation, incentive compensation plans and equity-based plans.

7.     Oversee plans for leadership development including succession planning.

8.     Administer and amend, as it determines appropriate, any present or future incentive compensation plan, equity-based plan or employee benefit plan providing that it shall be administered or amended by the Board or the Committee. The Committee is also authorized to exercise and perform any power, authority, discretion or duty of the Board or the Committee that any such plan provides shall be exercised or performed by the Board or the Committee, including without limitation to (i) issue or grant equity-based awards pursuant to such plan, (ii) authorize or reserve shares of common stock for issuance thereunder and (iii) make any such adjustments thereunder as the Committee may determine necessary or equitable to reflect any stock split of the Company's common stock.

9.     Create and amend, as it determines appropriate, any trusts related to any present or future incentive compensation plan, equity-based plan or employee benefit plan providing that it shall be administered or amended by the Board of Directors or the Committee. The Committee is also authorized to exercise and perform any power, authority, discretion or duty of the Board or the Committee that any such trust provides shall be exercised or performed by the Board or the Committee.

10.     Exercise direct responsibility for, and sole discretion over, the appointment, termination, compensation and oversight of the work of any External Advisor retained by the Committee.

11.     Review and assess annually the adequacy of this charter and, if appropriate, recommend changes to the charter to the Board

12.     Review and assess annually its performance and report the results to the Board.

13.     Have such other authority, duties or responsibilities as may be delegated to the Committee by the Board.

14.     Review the Company's compensation practices to ensure that these practices do not encourage excessive risk taking, including obtaining input

from the Chief Risk Officer, and taking into account risk outcomes in making its compensation determinations.

46. The Individual Defendants failed to carry out these core principles and additional duties by continually putting profits ahead of law-abiding behavior and improperly rewarding Defendants Nelms, Graf, Minetti, Guthrie, Talwar, and Hochschild with incentive based compensation for obtaining these ill-gotten gains. Indeed, the Board has completely failed in its oversight duty to clawback compensation from the Executive Defendants and other high level Company officials responsible for the illegal sales tactics that have resulted in over $200 million of settlements and other costs incurred by the Company to remedy the illegal activity.

## FACTUAL ALLEGATIONS

### Company Background

47. Discover is a direct banking and payment services company. Discover is one of the world's largest credit card issuers and in connection therewith offers a variety of fee-based add-on products. During the Relevant Period, the Individual Defendants allowed the Company to continue selling Discover Payment Protection, Identity Theft Protection, Wallet Protection, and Credit ScoreTracker despite the fact that they were aware of the compliance and legal issues that had arisen from the fraudulent and unethical marketing tactics used to sell the Protection Products based on meetings that were held to discuss these issues.

48. In 2007, Discover began aggressively marketing the Protection Products to its customers. The Protection Products were marketed as protective devices shielding consumers from fraudulent, unauthorized, or otherwise false charges; adverse events such as involuntary unemployment and unexpected health care costs; identity theft; lost wallets; and lowered credit scores.

49.     The Company used several aggressive, deceptive and misleading tactics to sell consumers these additional features.  Routinely during the Relevant Period, Discover enrolled customers in its programs using telemarketing and mailings that often resulted in customers being charged for these additional services without their consent and/or without knowledge that they would be charged for the services.  Discover was also able to use the personal information on file about its current credit card customers to prey on the weak and coerce them into purchasing the Protection Products.

50.     At the outset of the Relevant Period, as Discover began selling the Protection Products, the Individual Defendants were well aware of the perils of improperly marketing such products.  Since 2000, there have been a series of government and regulatory investigations into illegal and improper practices in the credit card add-on feature industry.

51.     For example, in December 2000, Providian Financial Corp resolved a consumer class action by agreeing to repay consumers $300 million due to allegedly deceptive business practices.

52.     In January 2003, First USA (then associated with Bank One Card Services), then the United States' largest issuer of Visa credit cards, agreed to a $1.3 million settlement following a three-year investigation by the attorneys general of California, Illinois, New York, and Vermont.  In the settlement agreement, First USA promised to closely monitor its third party vendors for future deceptive telemarketing aimed at its vast network of over 53 million credit card customers.  The First USA settlement dealt with issues very similar to those that would later affect Discover and the Individual Defendants should have paid them specific concern.  The Individual Defendants were aware of the pitfalls of aggressive, deceptive telemarketing practices, of failing to comply with, and

ensuring that Company-retained vendors comply with, the applicable regulations when selling credit card add-on features.

53.     Despite these warnings from within the industry, the Individual Defendants caused Discover to sell its Protection Products using highly questionable means. The Company frequently enrolled customers in the Protection Products based on highly deceptive telemarketing calls. Discover frequently charged customers for the Protection Products without the customer's consent or proper understanding that their credit card would be charged for the Protection Products. The Company was able to take advantage of its customers because it was in the unique position when compared to a normal outside telemarketer. Instead of having to ask for a potential customer's credit card number before completing a sale, Discover already controls the customer's credit card and has the number on file. Therefore it was normal practice to turn what appeared to be an innocent informative call into a nonconsensual sale.

54.     During the Relevant Period, Discover enrolled approximately 4.7 million customers in the various Protection Products.   Comparatively, as a portion of customer base, this number was 60% above the industry average.

55.     Discover Payment Protector was a service that allowed customers to defer payments on their credit card balances for up to 24 monthly billing periods in case of involuntary unemployment, hospitalization, disability, or other qualifying events. If customers had subscribed to Discover Payment Protector, they would pay no interest charges or late fees during the program's benefit activation period. Discover Payment Protector provided a service similar to credit insurance in that it prevented the customer from defaulting during the period he or she was affected by a qualifying event. The primary difference between Payment Protector and credit insurance was that

Payment Protector did not make the customer's payments for him or her during the period following the qualifying event; instead Payment Protector only temporarily suspended the customer's obligation to make payments.

56.     Discover routinely failed to fully disclose the material terms and conditions of the Payment Protector. For instance: when the customer has recovered from the qualifying event, or the 24 billing periods have passed, the full debt remains. Further, Discover intentionally marketed the Payment Protector to the elderly, self-employed, unemployed, part-time employed, those with a pre-existing condition, and other individuals who were barred from enjoying any benefit from the service according to the terms of the Payment Protector. The Company picked out its marks using a process called "post claims underwriting." Salespeople would intentionally ask very few questions of customers when selling them the Payment Protector, therefore not revealing that the customers—although signing up to pay for the service each month—were ineligible to receive the benefits they were paying for. Any customer that the Company could enroll in the program without any risk to the Company of having to provide a benefit was pure profit for the Company in the form of $0.89 per month for each $100 of outstanding balance on the customer's account. The only risk to the Company was secondary, in the form of the litigation that later stemmed from these practices.

57.     Identity Theft Protection was a service that claimed to prevent fraud before it damaged customers' credit ratings. The product was advertised to provide customers with daily monitoring of their credit reports with each of the three credit bureaus, provide fraud resolution specialists, provide email alerts of any changes in a customer's credit report, and to provide up to $25,000 in Identity Theft Insurance. Customers received these services for $12.99 per month. One

key flaw was that many customers were charged for both Identity Theft Protection and Credit ScoreTracker, and many of the products' features overlap.

58. Credit ScoreTracker was a service that provided customers with unlimited 24 hour a day, 7 days a week access to their Experian credit report and scores. Credit ScoreTracker also sent customers credit score change alert emails, showed customers the factors that can affect a credit score, and helped customers keep track of their credit score. Credit ScoreTracker cost customers $7.99 per month for just access to the Experian report. If customers wanted to access their credit reports from the other major credit reporting agencies, they were required to pay an additional $19.99 per month. Not disclosed by Discover was the fact that each of the credit agencies is required by law to give consumers one free credit report each year. In addition to the misleading aspect of charging for something that customers could largely get for free otherwise, the features of Credit ScoreTracker largely overlap with Identity Theft Protection. Many customers were charged $19.98 per month for both products, when either $12.99 for Identity Theft Protection or $7.99 for Credit ScoreTracker would have sufficed.

59. Wallet Protection was a service that purported to protect customers if their wallet was lost or stolen. In that unfortunate event, Discover agreed to contact the issuers of the customer's credit cards in order to cancel them. Another feature of Wallet Protection was that it monitored the customer's credit for a period of 90 days (later increased to 180 days) to ensure that no wrongful purchases or other actions had been taken. Wallet Protection also offered up to $1,000 in emergency cash for the customer. This program cost $2.99 per month. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



60.     The Protection Products that Discover sold to its customers during the Relevant Period were relatively inexpensive on a monthly basis and could easily have gone unnoticed to customers who do not closely inspect their monthly statements.    This was especially true for Discover Payment Protection, which only costs $0.89 per $100 of outstanding balance on the cardholder's account each month.  Even more egregious was the fact that this fee was charged to customers who carried any balance during any point in the month, even if they have paid in full by the due date.  Similarly inconspicuous was Wallet Protection appearing as a charge of $2.99 on each monthly statement.  Identity Theft protection charged $12.99 to each customers' account each month and Credit ScoreTracker charged $7.99.  Although these monthly fees might not raise a cardholder's suspicions in any one month, when aggregated over the course of a year they become quite exorbitant.

**Early Warnings**

61.



62.     The lucrative proceeds did not make the underlying tactics used to acquire it any less lawful.  In order to generate hundreds of millions of dollars of revenue from the Protection Products,

Discover violated several state and federal consumer protection laws, which exposed the Company to reputational damages and monetary losses.

63.



64. Despite this early warning that the Protection Products were an area that should be closely monitored, the Individual Defendants continued to allow the Protection Products to be sold using deceptive and illegal tactics.

65.





66.



67.

At this time the Board included Defendants Nelms, Weinbach, Smith, Moskow, Bush, Laskawy, Case, Aronin, and Devlin. Under Delaware law, each of these Individual Defendants was duty bound to have extensive awareness of the "Core Activities" of the Company and to make sure they were being carried out in a legal manner.

68.

69.    In 2009, the issue of credit card company accountability and predatory lending came into the forefront following the financial crash of 2008. On May 22, 2009 President Obama signed the Credit Card Accountability Responsibility and Disclosure Act of 2009 (the "CARD" Act). The CARD Act put in place measures to protect consumers from tactics like fee traps, required simpler

interest calculations, required opt-in for over-limit spending fees, and installed other similar measures. The CARD Act also served to put the Individual Defendants on notice that there would be enhanced regulatory scrutiny in connection with credit card add-on product fees.

70.     Also in 2009, the United States General Accountability Office ("GAO") published a report analyzing the marketing practices utilized by the credit card industry. The GAO report found that most credit card issuers were presently engaging in improper practices. These practices included improper, incomplete, and/or misleading delivery of plan information to consumers and retailers. This report also should have put the Individual Defendants on high alert that regulators were keeping an eye-out for predatory credit card practices.

71.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████  ██
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██  ████████████████████████████████████████████████████
████████████████████████████████████

72.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



73.

74.



75.

76.    Cardholders filed several new lawsuits during the summer of 2010 against the Company, alleging deceptive practices relating to the Protection Product.   On April 26, 2010, *Ackerman v. Discover Financial Servs., Inc.* was filed in the United States District Court for the District of New Jersey, No. 10-CV-02118-JAP-LHG.  On July 8, 2010, *Walker v. DFS Servs. LLC* was filed in the United States District Court for the Northern District of California, No. 10-CV-03013-SI.  And on July 16, 2010, *Conroy v. Discover Financial Services* was filed in the United States District Court for the Central District of California, No. 10-CV-05260-MMM-E.

77.



78. 

79.     During the fall of 2010, cardholders filed additional lawsuits against Discover, alleging deceptive practices relating to the Protection Products. On October 22, 2010, *Alexander v. Discover Financial Services, Inc.* was filed in the United States District Court for the District of South Carolina, No. 10-CV-02754, and on November 5, 2010, *Callahan v. Discover Financial Services, Inc.* was filed in this District (United States District Court for the Northern District of Illinois), No. 10-CV-07181-JWD.

80.     In December 2010 the Minnesota Attorney General converted the civil investigative demand into a formal suit for deceptive practices relating to the Protection Products. The suit named

Discover Bank, DFS Services, LLC and the parent company, Discover Financial Services (the nominal defendant herein), as defendants. *Minnesota v. Discover Financial Services, et al.,* No. 27-CV-10-27510 (Minn. Dist. Ct.).



81.     Additionally, on December 17, 2010, another lawsuit *Sack v. DFS Services, LLC* was filed in the United States District Court for the Western District of Tennessee, No. 10-cv-02906-JPM-CGC.   This was yet another case alleging deceptive tactics regarding the sales and marketing of the Protection Products.

82.



40



83.

84. Several additional lawsuits were filed against Discover in early 2011 relating to deceptive sales and marketing of the Protection Products. On January 14, 2011, *Boyce v. DFS Services, LLC* was filed in the United States District Court for the Eastern District of Pennsylvania,

No. 11-CV-00265-LDD.  On February 15, 2011, *Triplett v. Discover Financial Services, Inc.* was filed in the United States District Court for the Southern District of Florida, No. 11-CV-20519-AJ.  In February 2011, all of the pending consumer class actions against Discover were transferred into a Multi-District Litigation in this District (Northern District of Illinois), *In re: Discover Payment Protection Plan Marketing and Sales Practices* Litigation, MDL Docket No. 2217 (N.D. Ill.).  This was followed by an additional case being filed in the Eastern District of Pennsylvania, *Carter v. Discover Financial Services, Inc.* on March 7, 2011, No. 11-CV-01656-BMS.  The *Carter* case, like its predecessors, was transferred into the Multi-District Litigation in this District.

85.  ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████

86.  ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████

87.  ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

88. In June 2011, class counsel in the Multi-District Litigation and Discover entered into a preliminary settlement effectively resolving the bulk of the Protection Products consumer litigation. But it did not stop the flood of litigation concerning the Protection Products.

89. On August 16, 2011, the West Virginia Attorney General filed a lawsuit against the Company in the Circuit Court of Mason County, West Virginia asserting various claims relating to the Company's marketing and administration of the Protection Products under West Virginia law. *West Virginia v. Discover Financial Services, Inc. et al.*, No. 11-C-86-N (Va. Cir. Ct.). The lawsuit aimed to prohibit Discover from engaging in the alleged violations, to gain restitution for consumers, and sought disgorgement of monies attained using the complained of practices, civil penalties, and costs. The West Virginia case was ultimately settled for $1.95 million and alleged that "Defendants often enroll consumers for such services without the consumers' consent." *Id.,* Exhibit E at ¶ 4.

90. Shortly thereafter, on August 26, 2011, the Missouri Attorney General issued a request for information to the Company in connection with his investigation into whether Discover had engaged in conduct violative of Missouri law in its marketing of the Protection Products. That litigation was also settled. According to the Company's Form 10-Q filed with the SEC on November 1, 2013, it was disclosed that "[o]n August 26, 2011, the Attorney General of Missouri issued a request for information to the Company in connection with an investigation to determine whether the Company has engaged in conduct that violates Missouri law in the marketing of its payment protection product to its credit card customers. The Company has resolved this matter with the

Attorney General." There was no further disclosure detailing the terms and conditions of the resolution of the matter with the Missouri Attorney General.

91. In October 2011 Discover settled the Minnesota Attorney General action by entering into a Consent Judgment. The Minnesota Consent Judgment provided for Discover to pay $2 million "for investigative costs, civil penalties, and for the benefit of the State and the persons whom the State alleges were harmed," (Consent Judgment at ¶ 2), as well as prospective relief. *Id.* at ¶ 1. As the Board continued to deal with all the various Protection Product litigation, the Multi-District Litigation concerning the consumer actions moved further towards settlement. On November 9, 2011, the Court granted preliminary approval of the settlement reached by class counsel and Discover in June 2011.

92. Any reprieve for the Company from that preliminary approval of settlement was short-lived. On November 30, 2011, a new class action was filed by cardholders alleging that Discover had violated the TCPA. *Bradley v. Discover Financial Services* in the Northern District of California, No. 11-CV-05746, and also the later filed *Steinfeld v. Discover Financial Services* in the same District, No. 12-CV-01118-JSW, both originated with the uncorrected wrongs mentioned in the FCC citation issued on June 26, 2007 for violation of the TCPA. The *Bradley* and *Steinfeld* cases both entered into a settlement agreement on May 17, 2013 and then amended that settlement on July 18, 2013. The terms of the most recent settlement agreement include $8.7 million dollars to be paid by Discover to the settlement fund and $2.175 million dollars to be paid by Discover to plaintiffs' counsel for attorneys' fees. The cases are presently awaiting final approval of settlement and the court held its Final Approval Hearing on February 14, 2014.

44

93. In addition to the new state and consumer investigations and lawsuits, Discover, in its January 26, 2012 Form 10-K filed with the SEC, disclosed that the FDIC and CFPB were actively reviewing the Company's marketing practices with respect to the Protection Products. The 10-K also revealed that the FDIC and CFPB had notified Discover that they planned to take a joint enforcement action against the Company. In an attempt to diffuse this harsh language, Discover also stated in the 10-K that "Before the FDIC's and the CFPB's review began, Discover Bank made changes to both its fee-based products and program, and Discover Bank believes its current business practices substantially address the regulators' concerns."

94. The next spring the new lawsuits continued. On April 12, 2012, the Hawaii Attorney General filed a lawsuit against the Company in the First Circuit of Hawaii. Discover quickly removed the case, *Hawaii v. Discover Financial Services, Inc.*, No. 12-CV-00269-LEK-KSC (D. Haw), to the United States District Court for the District of Hawaii. The case asserted several claims relating to the Company's marketing and administration of the Protection Products under Hawaii law. The lawsuit aimed to prohibit Discover from engaging in the alleged violations, to gain restitution for consumers, and sought disgorgement of monies attained using the complained of practices, civil penalties, and costs.

95. On May 10, 2012, the Court granted final approval of the settlement of the Multi-District Litigation. Discover was ordered to pay $10.5 million to the settlement fund, including $3.5 million to plaintiffs' counsel in attorneys' fees.

96. Fresh on the heels of the large settlement of the Multi-District Litigation, Mississippi's Attorney General filed a new lawsuit against the Company in the Chancery Court of the First Judicial District of Hinds County, MS on June 28, 2012. *Mississippi v. Discover Financial Services, Inc. et al.*

asserted several claims relating to the marketing and administration of the Protection Products under Mississippi law. The lawsuit sought an injunction prohibiting Discover from engaging in the alleged violations, restitution, disgorgement, civil penalties, and costs. Following Mississippi, the State of New Mexico filed suit also alleging Discover violated the state's consumer protection act by engaging in illegal sales and marketing practices in the sale of its Protection Products. *New Mexico v. Discover financial Services, Inc.*, D-101-CV-2013-01107. These suits remain open.

97. Finally, on September 24, 2012, the FDIC and CFPB issued their Joint Consent Order. The Joint Consent Order required Discover to pay $200 million in restitution to the affected customers and a $14 million civil penalty. Additionally, the Order required Discover to keep specific records of its products for the next six years going forward, to correct its marketing materials for the products within 60 days, and to institute a broad spectrum of "Board Oversight" provisions. The "Board Oversight" section of the Order stated that:

> The Board shall participate fully in the oversight of Discover's compliance management system, and take full responsibility for ensuring that appropriate policies and procedures are in place. The Board shall also ensure that Discover adequately supervises its compliance-related activities, consistent with the role and expertise commonly expected for directors of banks of comparable size and complexity and offering comparable banking products and services. Without limiting the generality of the foregoing, the Board shall require, consistent with this Order, policies and objectives to ensure that all marketing, sales, and operations efforts relating to the Products comply with Section 5 [of the Federal Trade Commission Act] and with Section 1036 [of the Consumer Financial Protection Act], as described more particularly herein.

The Joint Consent Order was no surprise to any of the Individual Defendants, and very easily could have been avoided if they had taken the proper action to correct the unlawful marketing practices relating to the Protection Products earlier. Instead of acting when they first heard of the issues in late 2007, the Board turned a blind-eye and reaped the profits of the

Protection Products until numerous lawsuits and governmental investigations forced them to take action. This delay ended up causing the Company to lose hundreds of millions of dollars and irreparably damaging the Company's public image.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

98.     Plaintiff incorporates the allegations of ¶¶ 1-97 herein by reference.

99.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

100.    Plaintiff is a shareholder of Discover, was a shareholder of Discover at the time of the wrongdoing alleged herein, and has been a shareholder of Discover continuously since that time.

101.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

102.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Discovery Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

103.    At the time of the filing of this complaint, the Board of Discover consists of the following eleven individuals: Defendants Nelms, Weinbach, Aronin, Bush, Case, Glassman, Lenny, Maheras, Moskow, Smith, and Thierer. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act for the following reasons:

   a) As to Defendants Nelms, Weinbach, Aronin, Bush, Case, Glassman, Lenny,

Maheras, Moskow, and Smith, because as directors of the Company they directly participated in and approved the Company's inaction regarding the Protection Products during the Relevant Period from December 2007 forward in the face of growing problems, litigation and regulatory concern as set forth in ¶¶ 3-8,10-12, 50-52, 54, 57, 59, 61-97 and therefore are substantially likely to be held liable for the misconduct complained of herein.[8]

b) As to Defendants Smith, Bush, Glassman, Maheras, and Moskow, because as members of the Audit and Risk Committee during the Relevant Period they knowingly and deliberately ignored the risks involved with Protection Products and failed to recommend remedial actions until it was far too late, and therefore are substantially likely to be held liable for the misconduct complained of herein,

c) As to Defendants Case, Aronin, and Lenny, because as members of the Compensation and Leadership Development Committee they knowingly and deliberately ignored the wrongdoings alleged hereto performed by each of the Individual Defendants while awarding them excessive compensation, and therefore are substantially likely to be held liable for the misconduct complained of herein;

d) In addition to serving as the Chairman of Discover's Board, Defendant Nelms is also the Company's CEO. He has held those titles since 2009 and 2004, respectively. Accordingly, as admitted in the Company's 2013 Proxy Statement, Defendant

---

[8] Defendants Nelms, Weinbach, Aronin, Bush, Case, Moscow and Smith were directors from prior to the Relevant Period and throughout the entire Relevant Period through to the present and are being charged with consciously disregarding and/or knowledge of the problems with the Protection Products, and the litigation and regulatory concerns throughout the Relevant Period through to the present. Defendant Maheras became a director in September 2008, Defendant Lenny in February 2009 and Defendant Glassman in September 2009 and are being charged with consciously disregarding and/or knowledge of the problems with the Protection Products, litigation and regulatory concerns from the commencement of their directorship through to the present.

Nelms is not independent. In his position as CEO, Nelms stands to earn millions of dollars in annual salary, bonuses, and other compensation, all of which must be approved by the Company's current Compensation and Leadership Development Committee, comprised of Defendants Case, Aronin, and Lenny, and therefore Defendant Nelms lacks independence from these directors. Additionally, Defendant Nelms lacks the independence required to impartially consider a demand by the plaintiff, because he worked alongside Defendant Hochschild, as Senior Executives, at MBNA America Bank from 1994 to 1998. Due to their longstanding business and personal relationship, Defendant Nelms could not impartially consider a demand made against Defendant Hochschild;

e) As to Defendants Weinbach and Maheras, in addition to serving together on the Discover Board for over five years, the two have also served together on the board of trustees of the Carnegie Hall Corporation. Due to their longstanding business and personal relationship, Defendants Weinbach and Maheras could not impartially consider demands made against one another;

f) As to Defendants Aronin and Lenny, in addition to serving together on the Discover Board for over four years, the two have also served together on the Chicago Museum of Science and Industry's board of trustees. Due to their longstanding business and personal relationship, Defendants Aronin and Lenny could not impartially consider demands made against one another;

g) As to Defendants Moskow and Lenny, in addition to serving together on the Discover Board for over four years, the two have also served together on Alumni

Advisory Boards of Northwestern University's Kellogg School of Management. Due to their longstanding business and personal relationship, Defendants Moskow and Lenny could not impartially consider demands made against one another;

h) As to Defendant Maheras, he lacks the independence required to impartially consider a demand by the plaintiff, because he worked alongside Defendants Guthrie and Talwar at Citigroup, Inc. Defendant Maheras served for 23 years at Citigroup, culminating in his reign as Co-Chief Executive Officer of Markets & Banking and Co-Chairman in 2008. While at Citigroup, Inc., Defendant Maheras worked alongside Defendant Guthrie—who served as the President and CEO of CitiFinancial International, Ltd. from 2000 to 2004 and as President and CEO of CitiCapital from 2000 to 2001—and Defendant Talwar—who held various positions at Citigroup, Inc. from 1985 to 2000, culminating as country head of the consumer banking division in Poland. Due to his longstanding business and personal relationships with Defendants Guthrie and Talwar, Defendant Maheras could not impartially consider a demand made against them; and

i) As to Defendant Glassman, she lacks the independence required to impartially consider a demand by the plaintiff, because she worked alongside Defendant Laskawy at Ernst & Young LLP. Defendant Glassman worked for five years in the Risk Management and Regulatory Practice and the Quantitative Economics and Statistics group at Ernst & Young LLP, while Defendant Laskawy served Ernst & Young LLP for 40 years culminating in his tenure as Chairman and CEO from 1994 to 2001. Due to her longstanding business and personal relationship with Defendant

Laskawy, Defendant Glassman could not impartially consider a demand made against him.

104. Further, each of the Individual Defendants received extensive compensation during the Relevant Period, which was largely derived from the income generated by the Protection Products. A large portion of this compensation was incentive based and awarded by the Compensation and Leadership Development Committee, made up of Defendants Case, Aronin, and Lenny. The Compensation and Leadership Development Committee awarded large incentive based compensation for each the Executive Defendants during the Relevant Period using an incentive pool based on a percentage of the Company's after-tax net income. The incentive pool was set at 5% for 2008, 5% for 2009, 10% for 2010, and 8% for 2011. Sales of the Protection Products accounted for a large portion of the Company's after-tax net income during the Relevant Period and directly contributed to their excessive compensation. The compensation for the Executive Defendants was as follows:

| Defendant | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Nelms | $8,003,121 total | $8,298,308 total | $5,684,513 total | $8,552,921 total | $13,890,296 total |
| | $7,097,021 incentive based | $7,292,208 incentive based | $4,667,363 incentive based | $3,985,771 incentive based | $12,873,146 incentive based |
| Graf | N/A | N/A | N/A | N/A | $2,476,073 total |
| | | | | | $1,819,991 incentive based |
| Minetti | $4,224,389 total | $4,474,716 total | $3,232,269 total | $3,630,282 total | $4,970,769 total |
| | $3,743,289 incentive based | $3,968,616 incentive based | $2,590,119 incentive based | $1,863,132 incentive based | $4,303,619 incentive based |
| Guthrie | $3,162,782 total | $3,747,078 total | $3,108,193 total | $3,871,827 total | $4,180,242 total |

51

| | | | | | |
|---|---|---|---|---|---|
| | $2,645,253 incentive based | $3,240,978 incentive based | $2,466,043 incentive based | $1,954,677 incentive based | $3,778,880 incentive based |
| Talwar | N/A | N/A | N/A | $3,531,442 total | $4,722,481 total |
| | | | | $1,764,292 incentive based | $4,055,331 incentive based |
| Hochschild | $5,959,304 total | $6,929,415 total | $4,730,731 total | $5,667,983 total | $9,027,555 total |
| | $5,574,979 incentive based | $6,323,315 incentive based | $3,988,581 incentive based | $2,750,833 incentive based | $8,260,405 incentive based |

105.  The Compensation for the Director Defendants (excluding Defendant Nelms who was included above) during the Relevant Period was as follows:

| Defendant | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Weinbach | $176,791 | $371,890.19 | $338,755 | $299,991 | $299,984 |
| Smith | $160,124 | $355,956.19 | $297,505 | $249,991 | $249,984 |
| Moskow | $82,258 | $356,218.48 | $258,425 | $199,991 | $199,984 |
| Bush | $160,124 | $346,890.19 | $247,505 | $199,991 | $199,984 |
| Maheras | N/A | $30,537.34 | $209,112 | $199,991 | $199,984 |
| Glassman | N/A | N/A | $150,147 | $199,991 | $199,984 |
| Laskawy | $199,013 | $192,079.53 | N/A | N/A | N/A |
| Case | $160,124 | $346,890.19 | $270,352 | $224,991 | $224,984 |
| Aronin | $160,124 | $346,890.19 | $247,505 | $199,991 | $199,984 |
| Devlin | $160,124 | $346,890.19 | $247,505 | $199,991 | $199,984 |
| Lenny | N/A | N/A | $150,147 | $199,991 | $199,984 |

106. Because each of the Individual Defendants received this excessive compensation based on financial statements including income that was later refunded to customers and offset by fines, it amounts to corporate waste. Since they will not commence and vigorously prosecute this action and any demand upon them is futile. Additionally, Defendants Case, Aronin, and Lenny both determined and received the excessive compensation and therefore any demand upon made upon them would be futile.

## DAMAGES TO THE COMPANY

107. As a direct and proximate result of the Individual Defendants' misconduct, Discover failed to act to ensure that its marketing practices regarding its Protection Products were within the confines of the law, caused the Company to face numerous lawsuits and government investigations, caused the Company to spend hundreds of millions of dollars in defense costs, penalties, and restitution, and substantially damaged the Company's market capitalization and goodwill.

108. Furthermore, Discover has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

- costs incurred from having to follow the terms of the FDIC/CFPB Joint Consent Order;

- costs incurred by the Company in having to litigate the states' attorneys general actions;

- costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Discover's artificially-inflated performance; and

- costs incurred from the loss of the Company's customers' confidence in Discover.

109.    Moreover, these actions have irreparably damaged Discover's corporate image and goodwill such that Discover will suffer from what is known as the "liar's discount," a term attributed to stocks of companies implicated in improper behavior and having misled the public. This will severely hinder the Company's ability to raise equity capital or debt on favorable terms for the foreseeable future.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

110.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.    The Individual Defendants owed and owe Discover fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Discover the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

112.    All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

113.    Each of the Individual Defendants had actual or constructive knowledge that the Protection Products caused severe risks to the Company and were actually causing harm to the Company by subjecting the Company to numerous government investigations and lawsuits.  The Individual Defendants' actions (and inactions) could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

114.    The Individual Defendants caused or allowed Discover to lack requisite internal controls, and, as a result, the Company sold the Protection Products using tactics that have come back to damage the Company greatly.

115. The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

116. The Individual Defendants caused or allowed the risks involved with the deceptive and illegal sales tactics to be ignored because they were earning a large profit.

117. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Discover has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

118. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119. As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by causing the Company to pay improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

120. Moreover, even after the Company learned of the lawsuits and impending liability relating to the prior years' income, the Company continued awarding excessive compensation to the certain of its executive officers and directors.

121. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

122.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.    Each of the Individual Defendants were unjustly enriched by their receipt of excessive compensation in the form of increased annual base salaries, stock awards, and/or incentive based compensation, that was given based, in part, on the inflated sales numbers of the Protection Products, the profits from which have now been largely reimbursed to customers, and the poor judgment of the Compensation and Leadership Development Committee as complained of herein.  The Individual Defendants are thus in possession of money and other property which, in equity and good conscience, should be returned to the Company.

124.    It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for the Individual Defendants to retain the excessive and unwarranted financial payments they have received.

125.    To remedy the Individual Defendants' unjust enrichment, the Court should enter an order compelling them to disgorge to the Company the proceeds they received from increased annual base salaries, stock awards, and/or incentive based compensation.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Discover, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Discover to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Discover and its shareholders from a repeat of the damaging events described herein.

C.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury for all claims triable to a jury.

Dated: February 27, 2014

Respectfully submitted,

**FREED KANNER LONDON & MILLEN LLC**

By: /s/ William H. London
William H. London
Donald L. Sawyer
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224)-632-4521

**COHEN, PLACITELLA & ROTH, PC**
Stewart L. Cohen
Stuart J. Guber
Two Commerce Square
Suite 2900
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 567-3500

Facsimile: (215) 567-6019

**FARUQI & FARUQI, LLP**
Michael J. Hynes
Ligaya Hernandez
101 Greenwood Avenue, Suite 600
Jenkintown, Pennsylvania 19046
Telephone: (215) 277-5770
Facsimile: (215) 277-5771

-and-

**FARUQI & FARUQI, LLP**
Todd H. Henderson
369 Lexington Avenue, 10th Floor
New York, New York 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

*Attorneys for Plaintiff*